**SHORELINE ASSOCIATES**

v.

**John O. MARSH, Jr., et al.**

**Civ. A. No. M-81-3097.**

United States District Court,
D. Maryland.

Jan. 6, 1983.

Warren K. Rich, Stephen P. Kling, and Niles, Barton & Wilmer, Annapolis, Md., for plaintiff.

Carol E. Dinkins, Asst. Atty. Gen., and Michael W. Neville, Atty., Environmental Defense Section, Land and Natural Resources Division, U.S.Dept. of Justice, Washington, D.C., for defendants.

## MEMORANDUM AND ORDER

JAMES R. MILLER, Jr., District Judge.

The plaintiff, Shoreline Associates (Shoreline), seeks judicial review of the decision of the Secretary of the Army, acting through the Chief of the Corps of Engineers (Corps), denying its application for a permit to conduct activities in "navigable waters" of the United States within the meaning of section 10 of the Rivers and Harbors Act of 1899 (RHA), 33 U.S.C. § 403, and section 301 of the Clear Water Act (CWA), 33 U.S.C. § 1311.

Shoreline owns real property bordering Assawoman Bay, north of 94th Street and west of Ocean Highway, in Ocean City, Maryland. It proposes to develop a portion of its real property, including 8.2 acres of tidal wetlands, to accommodate a waterfront townhouse community and a boat storage and launching facility. That the tidal wetland areas in question are subject to federal regulation, specifically to grant of a permit by the Corps, is not disputed.[1]

Shoreline claims to be aggrieved because the Corps denied Shoreline a permit to dredge and fill the 8.2 acre area. The essence of Shoreline's claim is that the Corps' decision to deny the permit was arbitrary, capricious, unsupported by substantial evidence, and constituted an abuse of discretion.[2] Shoreline claims the Corps used inapplicable criteria,[3] and "fail[ed] adequately to (a) set forth the factual basis for the decision, (b) discuss the pertinent evidence of record, particularly that evidence which contradicts evidence relied upon to deny the application, and (c) develop and explain Defendants' rationale in denying the application."[4] Shoreline seeks a reversal and remand of the Corps' decision with instructions that the Corps issue the permit or reconsider its decision.[5]

The case is presently before the court on the defendants' motion for summary judgment.[6] The defendants contend that the case is ripe for judicial review without further evidentiary proceedings and defend the decision of the Corps on the merits, arguing that it was not arbitrary and capricious or an abuse of discretion. The plaintiff has responded to the defendants' motion[7] and oral argument has been held.

### I. Applicable Law

Section 10 of the Rivers and Harbors Act, *supra,* establishes a permit requirement for activities which take place in "navigable waters" of the United States or which affect navigation on such waters. Section 10 provides in pertinent part:

> "[I]t shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of . . . any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same."

33 U.S.C. § 403.[8]

The Clear Water Act, *supra,* formerly known as the Federal Water Pollution Control Act, is also applicable to this suit. The CWA authorizes a regulatory scheme to restore and maintain the "chemical, physical, and biological integrity of the nation's waters," 33 U.S.C. § 1251(a), through, *inter alia,* a prohibition on the discharge of pollutants to "navigable waters" of the United States, except in compliance with various provisions of the Act. 33 U.S.C. § 1311.

One of the exceptions, contained in section 404 of the CWA, 33 U.S.C. § 1344, authorizes the Corps of Engineers to issue permits for the discharge of materials to navigable waters when issuance of such a

---

1. Complaint at ¶ 3.

2. *Id.* at 12.

3. *Id.* at 13.

4. *Id.* at ¶ 16.

5. *Id.* at page 4.

6. Paper 10.

7. Paper 15.

8. The plaintiff does not take issue with characterization of the proposed activities as ones affecting navigable waters.

permit would serve to achieve the goals of the CWA. The Corps must evaluate applications for such permits through the application of guidelines developed by the Administrator of the Environmental Protection Agency in cooperation with the Secretary of the Army. The guidelines require consideration of the environmental, economic and esthetic efforts of such a proposed permit. 33 U.S.C. § 1343(c). The regulations promulgated under authority of the CWA are found at 40 CFR 230 (1981).

To obtain a permit, an application is submitted to the Corps District Engineer who reviews it for completeness, issues a public notice, prepares an environmental assessment, and determines if a public hearing is necessary. 33 CFR §§ 325.1 & 325.2. The District Engineer, in accordance with the applicable regulations and the record, determines if a permit should issue. 33 CFR § 325.2(a)(6). As part of his decision, the District Engineer is required to prepare findings of fact. *Id.*

The policies applicable to permit review are contained in 33 CFR 320 (1981). Additionally, the Fish and Wildlife Coordination Act, 16 U.S.C. § 662(a), requires the Corps to consult with the United States Fish and Wildlife Service before granting any permits affecting waters of the United States.

II. *Procedural History*

On March 10, 1979, Shoreline submitted an application for a permit to fill 10.5 acres of wetlands. On June 29, 1981, the plan was revised to include the filling of only 8.2 acres.[9] The District Engineer, on June 13, 1979, issued a public notice of the application pursuant to 33 CFR 325.2(a)(2). · Nu-

merous objection letters to the proposed project were filed with the Corps[10] by individual citizens and members of conservation groups. Representatives of the Corps, the Environmental Protection Agency, the Fish and Wildlife Service, the National Marine Fisheries Service, and Shoreline, met to discuss the application.[11]

The Environmental Protection Agency (EPA) filed its recommendation with the Corps on July 2, 1979. It recommended that the permit be denied[12] because development of the wetlands could not be supported under the EPA's guidelines. Similarly, the Fish and Wildlife Service and the National Marine Fisheries Service recommended denial of the application on July 30, 1979[13] and October 12, 1979,[14] respectively.

On January 5, 1981, the Corps received a copy of the "Opinion and Order" issued by the Maryland Department of Natural Resources Board of Review which granted, in part, the state permit application.[15]

Finally, on November 3, 1981, the Corps completed its "Environmental Assessment and Findings of Fact" in which it concluded that issuance of the permit would be contrary to the Corps and EPA guidelines and would not be in the public interest.[16] The application was denied.[17] Shoreline filed the instant action on December 8, 1981.

III. *Discussion*

A. *Judicial Review*

█ Judicial review of the Corps' decision to deny Shoreline's application for a permit is limited to review of the administrative record. *See Camp v. Pitts,* 411 U.S.

---

9. Paper No. 8, The Administrative Record (Adm.Rec.) at 240.

10. *See, e.g.,* Adm.Rec. at 14–68. Although many of these letters requested a public hearing, none was held. The District Engineer explained that a public hearing was not held because the requests came from objectors to the project and the project permit was eventually denied. *Id.* at 253.

11. Adm.Rec. at 73–84.

12. *Id.* at 86–87.

13. *Id.* at 112–13.

14. *Id.* at 179.

15. Adm.Rec. at 212–21. Maryland operates its own permit program to regulate filling of wetlands. *See Md. Nat. Res. Code. Ann.,* § 9–101 *et seq.* (1974).

16. Adm.Rec. at 250–56.

17. Adm.Rec. at 238–39.

138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) (per curiam); *Buttrey v. United States,* 690 F.2d 1170 (5th Cir.1982) (copy attached to Paper No. 16); *United States v. Holcomb,* 651 F.2d 231, 236 (4th Cir.1981); *Humana of Virginia, Inc. v. Blue Cross of Virginia,* 622 F.2d 76, 79 (4th Cir.1980); *Gables by the Sea, Inc. v. Lee,* 365 F.Supp. 826, 830 (S.D.Fla.1973), *aff'd,* 498 F.2d 1340 (5th Cir. 1974), *cert. denied,* 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d 801 (1975). In *Camp v. Pitts,* the Court determined that reviewing courts were forbidden from engaging in *de novo* inquiry on appeal from an agency decision where the administrative proceedings produced a reviewable record. 411 U.S. at 143, 93 S.Ct. at 1244. The Court stated:

> "The validity of the [agency's] action must, therefore, stand or fall on the propriety of that finding, judged, of course, by the appropriate standard of review. If that finding is not sustainable on the administrative record made, then the [agency's] decision must be vacated and the matter remanded to [it] for further consideration."

*Id.*

The present administrative record is adequate for judicial review. It contains contemporaneous findings of fact by the Corps as well as those by the various consulting agencies. It also contains the letters of objection from the public and conservation groups and numerous letters exchanged between the Corps and Shoreline. The decision of the Maryland Department of Resources Board of Review is also included. Most importantly, the District Engineer's sixteen page report, on which the final decision is based, setting forth the findings of fact and environmental assessment of the Corps, is included.

■ The court having determined that the record is adequate for review, the issue of the proper standard of review remains. Although Shoreline claims in its complaint

that the Corps decision was not based on substantial evidence,[18] it has in its memorandum in opposition to the defendants' motion for summary judgment apparently conceded that the appropriate standard of review is whether the Corps decision was arbitrary, capricious or an abuse of discretion.[19] Even without this apparent concession, it is well settled that the standard is that contained in section 10(e)(2)(A) of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Buttrey v. United States, supra; Citizens Against the Refinery's Effects (CARE) v. EPA,* 643 F.2d 178, 181–83 (4th Cir.1981); *Coalition for Responsible Regional Development v. Coleman,* 555 F.2d 398, 399–400 (4th Cir. 1977); *Deltona Corp. v. Alexander,* 504 F.Supp. 1280, 1284 (1981), *aff'd,* 682 F.2d 888 (11th Cir.1982). Section 10(e)(2)(A) provides in pertinent part:

> "To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law...."

5 U.S.C. § 706.

In interpreting this standard the Supreme Court has stated the court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." 401 U.S. at 416, 91 S.Ct. at 823. The Court has emphasized, however, that while:

> "this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. [A] court

---

**18.** Complaint at ¶ 12.

**19.** Paper No. 15 at 2, 3, etc.

is not empowered to substitute its judgment for that of the agency."

*Id.*

### B. *Procedural Due Process*

 Shoreline contends that it was denied procedural due process [20] since it was denied an evidentiary hearing and an opportunity for cross-examination of the experts of the Corps. While admitting that *Taylor v. District Engineer,* 567 F.2d 1332 (5th Cir.1978), negates the need for an adjudicatory hearing on every permit application, Shoreline cites *Appalachian Power Co. v. EPA,* 477 F.2d 495 (4th Cir.1973), for the proposition that where 1) material facts are at issue, and 2) private property rights are infringed, due process requires a formal adjudicatory hearing with cross-examination privileges.[21]

In considering the process due under the 1970 amendments to the Clean Air Act, the Fourth Circuit in *Appalachian Power* set out the guidelines in this Circuit for the right to a full trial-type hearing. Speaking for the court, Judge Russell stated:

" 'Procedural requirements (dealing with the requirement of hearings in administrative proceedings) depend in part on the importance of the issues before the agency' and 'the kind of procedure required must take into account the kind of questions involved.' Accordingly, if the resulting administrative action, whether *regarded as rulemaking or otherwise,* 'is individual in impact and condemnatory in purpose' or 'when the issue presented is one which possesses great substantive importance, or one which is unusually complex or difficult to resolve on the basis of pleadings and argument,' a hearing preceding any final administrative action is appropriate. On the other hand, *if a public hearing would appear unnecessary,*

*either because of other available procedures* or because the proceeding presents 'only a question of law without dispute on the facts' or '*the ultimate decision will not be enhanced or assisted by the receipt of evidence*' a prior hearing may be dispensed with."

477 F.2d at 500–501 (citations omitted) (emphasis supplied).

The highlighted language indicates the Fourth Circuit recognizes that agencies may employ alternative procedures and still satisfy the requirements of the Due Process Clause. *See Cleveland Electric Illuminating Co. v. EPA,* 572 F.2d 1150, 1159–60 (6th Cir.1978); *Regents of Univ. of Minnesota v. National Collegiate Athletic Ass'n,* 560 F.2d 352, 371 n. 32 (8th Cir.1977). In the present case, the plaintiff was afforded an opportunity to respond, in writing, to the objections of the public and conservation groups. It was also given the opportunity to make written submissions of expert witness testimony. There was more than sufficient time and opportunity for written submissions of expert testimony to rebut the findings and conclusions of the consulting agencies.[22] That the plaintiff chose to rely solely on the brief written report of one expert, Dr. Copeland, does not render the procedure of the defendants deficient.

Equally as important as the opportunity for written submissions of evidence were the plaintiff's opportunities to discuss the application with the Corps in face-to-face informal meetings of the parties. The record indicates[23] that Shoreline requested a site visit by the Corps with Shoreline's representatives present. This request was granted, and the District Engineer met with Shoreline's legal counsel and Dr. Copeland at the project site on August 17,

---

20. Paper No. 10 at 13–15.

21. Paper No. 15 at 13–14.

22. On November 26, 1979 the Corps forwarded to Shoreline copies of correspondence from the Fish and Wildlife Service, the Environmental Protection Agency, and the National Marine Fisheries Service. The Corps indicated the pri-

mary concern of each of these consulting agencies, that greater utilization could be made of the upland portions of the plaintiff's property without destroying protected wetlands. Adm. Rec. at 195–96.

23. Adm.Rec. at 234.

1981.[24] During the site inspection, representatives of the parties walked the perimeter of the proposed project, and the District Engineer pointed out the freshwater wetlands to Shoreline's representatives. Various types of wildlife and vegetation were sighted which findings were later incorporated in the District Engineer's final report.

A letter from Shoreline's counsel to the Corps following the site visit indicates that Dr. Copeland's opinions were the subject of conversation at the informal meeting of the parties.[25] In fact, the entire record indicates a running dialogue through written communications between the plaintiff and defendants. There is no indication that any limit was placed on the quantity of material submitted to the Corps or on the frequency of submissions.

In this court's view, the opportunities for limitless written communications coupled with the informal meeting of the parties, *see Buttrey, supra* at 1176–78 (approved use of informal meeting), constituted an adequate alternative to an adjudicatory hearing sufficient to satisfy the guidelines of *Appalachian Power.*

The court also finds that the other exception to the requirement of an adjudicatory hearing outlined in *Appalachian Power,* this is, that the "ultimate decision [would] not be enhanced or assisted by the receipt of evidence," is met in this case. The only purpose arguably served by a hearing, which was not as adequately served by the written submission of evidence, was the opportunity to cross-examine the defendants' experts. The opportunity to cross-examine expert witnesses, in contrast to the opportu-

nity to supply written rebuttal evidence, is of questionable value.

In the context of determining continued entitlement to Social Security disability benefits, the Supreme Court discussed the necessity for cross-examination of expert medical witnesses, *Mathews v. Eldridge,* 424 U.S. 319, 343–45, 96 S.Ct. 893, 907, 47 L.Ed.2d 18 (1976). The Court concluded that due process did not require the opportunity for cross-examination for the reason that the credibility and veracity of the witnesses was not usually at issue with expert witnesses.

"In *Richardson* [*v. Perales,* 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)] the Court recognized the 'reliability and probative worth of written medical reports,' emphasizing that while there may be 'professional disagreement with the medical conclusions,' the 'specter of questionable credibility and veracity is not present.' To be sure, credibility and veracity may be a factor in the ultimate disability assessment in some cases. But procedural due process rules are shaped by the risk of error inherent in the truth-finding process as applied to the generality of cases, not the rare exceptions."

424 U.S. at 344, 96 S.Ct. at 907 (citations omitted).

Similarly, in this case, where only scientific issues are in dispute, the veracity of expert witnesses is not usually at issue and their credibility can easily be ascertained from written submission of their scientific credentials.[26] This conclusion is buttressed by the decision of the Fifth Circuit in *But-*

---

24. Adm.Rec. at 234 & 236. Although the plaintiff has also objected to the Corps' reliance on documents in the record which were not made available to the plaintiff, among which are the District Engineer's notes following site visits, the documents complained of contain information which is also contained in the agency reports which were given to the plaintiff. Since the documents contain only duplicative information, and the plaintiff did not rebut the information in the agency reports, this objection of the plaintiff is unfounded. Neither can the plaintiff object to non-disclosure of the District Engineer's notes for that site visit which was attended by Shoreline's representatives. Any-

way, the court agrees with the defendants' contention that the materials complained of are within the disclosure exception outlined in *Taylor v. District Engineer,* 567 F.2d 1332 (5th Cir.1978). *See* defendants' reply brief, Paper No. 16 at 5–6.

25. Adm.Rec. at 237.

26. Although the only expert witness' credentials of record in this suit are those of the plaintiff's witness, there is no indication that the plaintiff sought to ascertain the credentials of those persons upon whom the Corps relied.

*trey, supra,* where it stated that "[m]any courts and commentators have concluded that cross-examination of scientific witnesses in a case of this sort [*Buttrey* concerned an appeal from the Corps' decision to deny a permit for discharge of dredge material in wetlands.] is often, if not always, an exercise of futility. *Id.* at 1182, citing, among others, *Mathews v. Eldridge, supra; Basciano v. Herkimer,* 605 F.2d 605, 610–11 (2nd Cir.1978), *cert. denied,* 442 U.S. 929, 99 S.Ct. 2858, 61 L.Ed.2d 296 (1979); 3 D. Davis, *Administrative Law Treatise* § 15:10 at 184 (2nd ed. 1980); Ames & McCracken, *Framing Regulatory Standards to Avoid Formal Adjudication: The FDA as a Case Study,* 64 Calif.L.Rev. 14 (1976).

Keeping in mind that due process is "intensely practical," *Goss v. Loqez,* 419 U.S. 565, 578, 95 S.Ct. 729, 738, 42 L.Ed.2d 725 (1975), the court believes the plaintiff has been afforded "notice of the case against [it] and an opportunity to meet it," *Mathews v. Eldridge, supra,* 424 U.S. at 348, 96 S.Ct. at 909, *citing Joint AntiFascist Comm. v. McGrath,* 341 U.S. 123, 171–72, 71 S.Ct. 624, 648–49, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring). "All that is necessary is that the procedures be tailored, in light of the decision to be made, to 'the capacities and circumstances of those who are to be heard,' *Goldberg v. Kelly,* 397 U.S., [254] at 268–69 [90 S.Ct. 1011 at 1021, 25 L.Ed.2d 287] (footnote omitted), to insure that they are given a meaningful opportunity to present their case." 424 U.S. at 349, 96 S.Ct. at 909. This has been done in this case.

At the oral argument on this matter, the plaintiff argued for the first time that the regulations regarding hearings were not applicable to the circumstances in this case because these regulations were developed prior to the 1977 amendments to the Clean Water Act when the Act encompassed only "navigable waters" or those areas below the mean high-water mark. The plaintiff argued that when Congress in 1977 extended the Clean Water Act to areas above the mean high-water mark it did not authorize or contemplate application of the same regulations to the areas below and above the mark. At the hearing, the court granted the plaintiff ten (10) days to file a supplemental memorandum in support of its new argument. The memorandum subsequently filed by the plaintiff apparently abandons this argument. Instead, the plaintiff has embellished its original argument that the regulations, as applied in this case, violate the Due Process Clause.

The Fifth Circuit in *Buttrey, supra,* held that the developer of a residential community was not entitled to a trial-type hearing, by statute or under the Constitution, on its application for a permit to channelize a half-mile long portion of a small, slow running stream. The court based its analysis on the Supreme Court's opinion in *Mathews v. Eldridge, supra,* where the Court set out the three most important considerations that a court should balance when determining what process is due.

"First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

424 U.S. at 335, 96 S.Ct. at 903 (citation omitted).

In connection with the first factor, the *Buttrey* court stated:

"Buttrey clearly has a strong 'private interest' in turning what is now commercially worthless swampland into residential homes, which he could then sell. It is equally clear that he is also not a person 'on the very margin of subsistence' and that denial of his application will not deprive him of 'the very means by which to live.' 424 U.S. at 340, 96 S.Ct. at 905. The government, moreover, is doing nothing more than denying him a permit; it is not taking action against him. The distinction is important, for, as Judge Friendly has remarked, '[r]evocation of a

license is far more serious than denial of an application for one; in the former instance capital has been expended, investor expectations have been aroused, and people have been employed.' *Friendly, supra* at 1296. The government, in other words, has not taken anything of Buttrey's and made it worth less; rather, it has merely told Buttrey that (at least under his current proposal) he must keep what he has without attempting to make it worth more."

*Buttrey* at 1177.

Shoreline distinguishes *Buttrey* on the ground that the property at issue there was below the mean high-water mark and here it is above. Shoreline contends apparently that because of this distinction the private interest at issue there was less than in the present case. It is clear, however, that the court in *Buttrey* considered the private interest at issue there as one of commercial worthlessness if the permit to dredge were denied versus substantial commercial value if the permit were issued. In *Buttrey,* as in this case, the plaintiff's wetlands were essentially valueless without the Corps' permit approval and were commercially worth a great deal with their approval. Thus, the private interest of the plaintiff before this court and that before *Buttrey* is identical.

Although Shoreline suggests that the Government's interest at stake is less when property above the mean high-water mark is at issue than when property below it is at issue,[27] this court does not agree. The interest may be different, but it is no less. The Government's interest in property below the high-water mark is principally in maintaining its navigability whereas its interest in property above is in sustaining and improving the environment. The plaintiff has cited nothing to support a conclusion that one interest is any greater than the

other and the court has found no such support. The language of the Clear Water Act, its amendments and its legislative history support the contrary position.

Similarly, evaluation of the second *Eldridge* factor, the risk of erroneous deprivation of due process, is the same in this case as in *Buttrey.*

There is no substantial difference between the *Eldridge* factors which faced the court in *Buttrey* and those which face this court. The decision in *Buttrey* is sound precedent for concluding that Shoreline was not entitled to an adjudicatory hearing under the Due Process Clause.

█ Assuming that the plaintiff did have a right to an adjudicatory hearing, none was requested. The plaintiff has cited no authority for the proposition that an agency must offer gratuitously to hold such a hearing. Authority is to the contrary. *See National Asphalt Pavement Ass'n v. Train,* 539 F.2d 775, 782 (D.C.Cir.1976); *Gables by the Sea, Inc. v. Lee,* 365 F.Supp. 826 (S.D. Fla.1973). *See also Consolidation Coal Co. v. EPA,* 537 F.2d 1236 (4th Cir.1976).

Neither has the plaintiff challenged the regulations promulgated for processing of permit applications. *See* 33 CFR § 325.2 *et seq.* These regulations set out the procedure to be followed for request of a hearing. 33 CFR § 327.4(b).[28]

Shoreline contends there has been a denial of due process even if it had no right to a hearing.[29] The essence of its complaint in this regard is that it did not have an opportunity to respond to the evidence relied on by the Corps. This argument, addressed in part previously in this opinion,[30] is without merit. The Corps notified Shoreline of the consulting agencies' decisions[31] and even highlighted that portion which it thought to be crucial. The plaintiff's contention that

---

**27.** Supplemental Memorandum of Shoreline Associates, Paper No. 17, at 5–6.

**28.** *See* note 10, *supra.* Any challenge to the regulations would, in any event, seemingly be futile. The 1972 regulations, substantially identical to the present regulations, were held to comport with due process in *Taylor v. District Engineer, supra.*

**29.** Paper No. 15 at 15–16.

**30.** Pp. 10–12, *supra.*

**31.** Note 22, *supra.*

it had insufficient opportunity to respond is discounted by the fact that it did, in fact, submit responsive materials in what the court has characterized previously as a "running dialogue" with the Corps.[32]

### C. Merits of the Corps' Decision

In addition to the procedural issues discussed above, Shoreline contends the Corps' decision was arbitrary and capricious, because the Corps failed, in the plaintiff's view, to consider site-specific evidence supplied by the plaintiff.[33] In this regard, the plaintiff argues, without authority, that once site-specific information is presented to the Corps, "it is incumbent upon governmental agencies to address meaningfully and contradict that information, if the application is to be denied."[34] Assuming, without deciding, that the Corps bears such a burden, the record contradicts the plaintiff's contention that site-specific information was not considered.

The regulations by which the Corps was bound set forth the relevant factors to be considered by the Corps in making its decision. The Corps is directed to evaluate the "probable impact which the proposed activity may have on the public interest . . . ." 33 CFR § 320.4(a). "The benefit which reasonably may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments. . . ." *Id.* Among the factors to be considered are:

> ". . . conservation, economics, aesthetics, general environmental concerns, historic values, fish and wildlife values, flood damage prevention, land use, navigation, recreation, water supply, water quality, energy needs, safety, food production, and, in general, the needs and welfare of the people."

*Id.*

█ In accordance with these regulations, the Corps considered the relevant fac-

tors in its public interest review. Furthermore, it considered them in the context of the particular project proposed by Shoreline. The record indicates that the Corps gathered site-specific evidence on three occasions when its representatives visited the subject wetlands. They gathered information regarding the types of vegetation and wildlife involved as well as information regarding erosion factors and flooding. The EPA visited the site on one occasion[35] and listed examples of the life found in the wetlands. Although the statement of the EPA as to the value of these species of life was a general one, this does not invalidate the information provided by it. Similarly, the FWS visited the site on three occasions and, on at least one of these occasions, the plaintiff's representatives attended.[36] Again, the report of the FWS biologist documents the value of this particular wetland to the environment. For example, the biologist concluded that the "project site is a diverse area which supports many wildlife species." He went on to list those species. The plaintiff seems to imply that because the species listed by the consulting agencies were not in danger of becoming extinct, they are not important.[37] There is no support for such an argument either in law or in the regulations. As well, the fact that the plaintiff's expert, Dr. Copeland, may have concluded that the subject wetlands are valueless from an ecological standpoint is not conclusive nor is it binding on the Corps. Indeed, Dr. Copeland's observations of the area are inconsistent with his conclusion. He concluded that the lower portions were valuable, but could only say that, in his opinion, "it is very doubtful" that the landward portion of the marsh contributes much, if anything, to the productivity of the Bay."[38] He also found that the marsh provided a habitat for birds, "20 or so spe-

---

**32.** Adm.Rec. at 102, 182, 197.

**33.** Paper No. 15 at 3–4.

**34.** *Id.* at 4.

**35.** Adm.Rec. at 86.

**36.** Adm.Rec. at 112–13.

**37.** *Id.* at 15.

**38.** *Id.* at 104.

cies," wildlife, and aquatic animals. To conclude, as the plaintiff has, that the Corps did not consider site-specific information is erroneous.

The Corps also had undisputed site-specific information which, under the applicable regulations, was of utmost importance to it in balancing the public interest. 33 CFR § 320.4(b) provides in pertinent part:

"(b) *Effect on wetlands.* (1) Wetlands are vital areas that constitute a productive and valuable public resource, the unnecessary alteration or destruction of which should be discouraged as contrary to the public interest.

(2) Wetlands considered to perform functions important to the public interest include:

(i) Wetlands which serve important natural biological functions, including food chain production, general habitat, and nesting, spawning, rearing and resting sites for aquatic or land species;
. . . ."

Based on the site visits of the Corps, EPA and FWS, the Corps acted within its lawful discretion in concluding, as it obviously did,[39] that the subject wetlands were important. Once again, the information provided by the plaintiff's own expert corroborates the findings that the wetlands were important within the meaning of 33 CFR § 320.-4(b)(2)(i). This court cannot say that the Corps' decision was a clear error of judgment.

Having determined that the subject wetlands were important within the meaning of § 320.4(b)(2), the Corps was bound by subsection (4) of that regulation which states in pertinent part:

"(4) *No permit will be granted,* to work in wetlands identified as important by paragraph (b)(2) of this section, *unless the District Engineer concludes,* on the basis of the analysis required in paragraph (a), above, that the benefits of the

proposed alteration outweigh the damage to the wetlands resource and *the proposed alteration is necessary to realize those benefits.* In evaluating whether a particular alteration is necessary, *the District Engineer shall consider* whether the proposed activity is primarily dependent on being located in, or in close proximity to the aquatic environment and *whether feasible alternative sites are available.* The applicant must provide sufficient information on the need to locate the proposed activity in the wetland and must provide data on the basis of which the availability of feasible alternative sites can be evaluated."

33 CFR § 320.4(b)(4) (emphasis supplied).

■ The Corps, as well as each of the consulting agencies, concluded that Shoreline had alternatives available to it because the townhouse community could be constructed on upland property belonging to Shoreline. Shoreline's contention that this is untrue, because its project is designed to maintain the park-like atmosphere of the upland areas and because the project is dependent on construction of a boat storage area and launch, is untenable. The primary aspect of the proposed project is the construction of a townhouse community, not the construction of a boat storage facility and launch which are incidental to it.[40] Shoreline has failed to show, in compliance with the regulations, why it is necessary for the townhouses to be located on the wetlands rather than the uplands, except for its preference to build on the wetlands.

The Corps was also bound by the Clean Water Act, 33 U.S.C. § 1344, to consider the guidelines promulgated by the EPA. These guidelines provide that:

"From a national perspective, the degradation or destruction of special aquatic sites, such as filling operations in wetlands, is considered to be among the most

---

**39.** Adm.Rec. at 250, ¶ 2.

**40.** If Shoreline firmly believed that the boat facilities were of primary importance, it could have sought a permit for this activity alone which, presumably, would have required a

much reduced impact on the wetlands. Appendix B in Shoreline's permit application clearly shows that the vast bulk of the filling of 8.2 acres was necessitated by the housing development itself.

severe environmental impacts covered by these Guidelines. The guiding principle should be that degradation or destruction of special sites may represent an irreversible loss of valuable aquatic resources." 40 CFR § 230–1(d).

They also provide that:

"[N]o discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences."

40 CFR § 230.10(a).

Similar protection is provided by section 230.12(a)(3)(i):

"(a) On the basis of these Guidelines (Subparts C through G) the proposed disposal sites for the discharge of dredged or fill material must be:

(1) Specified as complying with the requirements of these Guidelines; or

(2) Specified as complying with the requirements of these Guidelines with the inclusion of appropriate and practicable discharge conditions (see Subpart H) to minimize pollution or adverse effects to the affected aquatic ecosystems; or

(3) Specified as failing to comply with the requirements of these Guidelines where:

(i) There is a practicable alternative to the proposed discharge that would have less adverse effect on the aquatic ecosystem, so long as such alternative does not have other significant adverse environmental consequences; or . . . ."

Finally, the EPA's guidelines provide for the protection of "special aquatic sites": [41]

"(3) Where the activity associated with a discharge which is proposed for a spe-cial aquatic site (as defined in Subpart E) does not require access or proximity to or sitting within the special aquatic site in question to fulfill its basic purpose (i.e., is not 'water dependent'), practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise. In addition, where a discharge is proposed for a special aquatic site, all practicable alternatives to the proposed discharge which do not involve a discharge into a special aquatic site are presumed to have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise."

40 CFR § 230.10(a)(3).

The court finds no error in the Corps' application of these guidelines. The Corps found the proposed project was contrary to the guidelines because the alternative available, elimination of wetland destruction, was more environmentally acceptable than the project as proposed.[42] This court cannot say that EPA's report, or the Corps' reliance on it, was erroneous, an abuse of discretion or arbitrary and capricious.

IV. *Conclusion*

The administrative record reveals that the Corps considered all the evidence of record and afforded the plaintiff a fair opportunity, consonant with due process, to rebut the evidence against it. Shoreline's argument on the merits is essentially a disagreement with the Corps' conclusion, based on all the scientific evidence before it, including that presented by the plaintiff, that the subject wetlands were of value to the environment. Under the limited scope of review applicable to this case, the court finds no error in either the procedures used by the Corps to arrive at its decision or in the factual basis of that decision. Therefore, this court finds that the decision of the

---

**41.** Although the plaintiff contends that the subject wetlands are not "special aquatic sites" within the meaning of EPA regulations, this contention is erroneous. Section 230.3(q–1) states that " 'special aquatic sites' means those sites identified in Subpart E." Subpart E, at section 230.41, clearly identifies wetlands as a special aquatic site. Furthermore, any doubt can be resolved by reference to section 230.1(d) which states that "the degradation or destruction of special aquatic sites, such as filling operations in wetlands, is considered to be among the most severe environmental impacts covered by these Guidelines."

**42.** Adm.Rec. at 252.

Corps denying the permit application of Shoreline was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. The motion of the defendants for summary judgment will be granted.

Accordingly, it is this 6th day of January, 1983, by the United States District Court for the District of Maryland, ORDERED:

The motion of the defendants for summary judgment (Paper No. 10) is GRANTED.