27 F.3d 1341
 24 Envtl. L. Rep. 21,609
 The NATIONAL WILDLIFE FEDERATION, Plaintiff,
Michael Donahue, Plaintiff-Appellant,
v.
LTC John WHISTLER, Acting District Engineer, U.S. Army Corps
of Engineers; Col. Stewart H. Bornhoft, District Engineer,
U.S. Army Corps of Engineers; U.S. Army Corps of Engineers;
Arthur E. Williams, Commander, U.S. Army Corps of
Engineers; Turnbow Development Corporation; Kevin Turnbow,
Defendants-Appellees.
 No. 93-1729.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Dec. 17, 1993.
Decided June 29, 1994.
 
 Lyle Howard Moe, Grand Forks, ND, argued, for appellant.
 John A. Bryson, Washington, DC, argued (Rebecca A. Lloyd and Robert L. Klarquist, on the brief), for appellee.
 Before MORRIS SHEPPARD ARNOLD, Circuit Judge, JOHN R. GIBSON*, Senior Circuit Judge, and BARTLETT**, District Judge.
 JOHN R. GIBSON, Senior Circuit Judge.
 
 
 1
 The Turnbow Development Corporation sought permission from the United States Corps of Engineers to make several changes necessary to provide water access to a planned residential development. The Corps issued the permit pursuant to section 10 of the Rivers and Harbors Act, 33 U.S.C. Sec. 403 (1988), and section 404(b) of the Clean Water Act, 33 U.S.C. Sec. 1344(b) (1988), but conditioned it on forty-two conditions, including the required enhancement of a twenty-acre mitigation area. The National Wildlife Federation and Michael Donahue, a Federation member and an owner of property adjacent to the mitigation area, brought this action before the district court[1] seeking to suspend the permit. The district court denied the requested relief and granted summary judgment for the defendants. Donahue appeals from the district court's judgment.[2] We affirm.
 
 
 2
 The planned housing development is located just south of Bismarck, North Dakota, on uplands on the east side of the Missouri River. The requested permit would allow Turnbow to provide these lots with boat access to the Missouri River by re-opening an old river channel adjacent to the planned development, thereby destroying the channel's existing wetlands[3] status. The proposed project would remove an earthen roadway, dredge and widen the old river channel, widen the connection of the old channel to the Missouri River, and replace 200 feet of bank stabilization on the Missouri River. In total, approximately 14.5 acres of wetlands would be converted to deep water habitat.
 
 
 3
 As required by 33 C.F.R. Sec. 325.2-.3, the Corps gave public notice of the application and solicited comments from several state and federal agencies. These agencies suggested that the Corps condition the permit on a mitigation plan to offset the loss of wetlands, but lodged no further objections. Turnbow responded with a plan to enhance an existing twenty-acre wetlands area by providing it with year-round water and saturated soil conditions. After additional public notice and comment, the Corps issued an environmental assessment and decision document containing the agency's determination that the permit should be issued. The Corps concluded that the project's purpose was to provide boat access to the Missouri River from Turnbow's planned development. Given this purpose, the Corps considered the project water-dependent and site-specific. No other alternative, the Corps stated, would serve Turnbow's purpose. "A boat access area located elsewhere," the agency reasoned, "would not be functional for the applicant's needs." The Corps concluded that the permit did not conflict with the public interest and satisfied the Clean Water Act section 404(b)(1) guidelines. The agency further found that the project involved no significant impact on the quality of the human environment, and therefore did not require an environmental impact statement under the National Environmental Policy Act, 42 U.S.C. Sec. 4321-4370a (1988). The agency issued the permit subject to forty-two conditions, including the requirement that Turnbow complete the enhancements to the mitigation area prior to any construction on the wetlands.
 
 
 4
 Donahue and the Federation sought a temporary restraining order and preliminary injunction to suspend the permit. The court denied the request for a temporary order and, after a two-day evidentiary hearing on the preliminary injunction issue, granted the Corps' motion for summary judgment. The court determined that "the Corps did not act in an arbitrary and capricious manner in processing and issuing the permit involved here." National Wildlife Fed'n v. Whistler, No. A1-92-194, slip op. at 5 (D.N.D. Jan. 12, 1993). The court also stated that "no other properties are available to Turnbow which are suitable for residential lots with boat access to the river." Id. This appeal followed.
 
 
 5
 Donahue argues on appeal that the Corps failed to perform an adequate alternatives analysis, as required by 40 C.F.R. Sec. 230.10, before issuing the permit. In particular, Donahue argues that the Corps completely failed to consider the feasibility of a nearby public boat ramp as a means of water access to residents. The Corps responds that it properly conducted an alternatives analysis, specifically considering and rejecting three categories of response: (1) no action, (2) reduction of the scope of dredging, and (3) use of other sites.
 
 
 6
 Section 404 of the Clean Water Act authorizes the Secretary of the Army, acting through the Corps, to issue permits "for the discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. Sec. 1344(a), (d). "The decision whether to issue a permit will be based on an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest." 33 C.F.R. Sec. 320.4(a). The regulations specifically identify wetlands as worthy of protection. See 33 C.F.R. Sec. 320.4(b) (wetlands are a "productive and valuable public resource"). The statute and regulations express a strong preference for wetland protection. "It would hardly be putting the case too strongly to say that the Clean Water Act and the applicable regulations do not contemplate that wetlands will be destroyed simply because it is more convenient than not to do so." Buttrey v. United States, 690 F.2d 1170, 1180 (5th Cir.1982), cert. denied, 461 U.S. 927, 103 S.Ct. 2087, 77 L.Ed.2d 298 (1983). Thus, where "there is a practicable alternative ... which would have less adverse impact on the aquatic ecosystem," the Corps cannot issue a dredge or fill permit. 40 C.F.R. Sec. 230.10(a) (1993) (emphasis added). Moreover, if a dredge or fill permit application does not concern a water-dependent project, the Corps assumes that practicable alternatives exist unless the applicant "clearly demonstrated otherwise." 40 C.F.R. Sec. 230.10(a)(3). This presumption of practicable alternatives "is very strong," Buttrey, 690 F.2d at 1180 (emphasis in original), "creat[ing] an incentive for developers to avoid choosing wetlands when they could choose an alternative upland site," Bersani v. Robichaud, 850 F.2d 36, 44 (2d Cir.1988), cert. denied, 489 U.S. 1089, 109 S.Ct. 1556, 103 L.Ed.2d 859 (1989).
 
 
 7
 Despite these protections, Donahue faces an uphill road. When the Corps has followed the proper procedure, as here, a court may reverse only if the Corps' decision to issue the permit was an abuse of discretion, contrary to law, or arbitrary and capricious. 5 U.S.C. Sec. 706(2)(A) (1988). Under this standard, a reviewing court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983) (quoting Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974)). As long as the agency provides a rational explanation for its decision, a reviewing court cannot disturb it. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971). This narrow standard of review reflects the deference given to agencies' expertise within their respective fields. State Farm, 463 U.S. at 42-43, 103 S.Ct. at 2866-67. Moreover, substantial deference is given to an agency's interpretation and application of governing statutes, Chevron U.S.A. Inc. v. Natural Resources Defense Council, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782-83, 81 L.Ed.2d 694 (1984), and particularly its own regulations, Ford Motor Credit Co. v. Milhollin, 444 U.S. 555, 566, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980).
 
 
 8
 Donahue argues that the Corps failed to even consider the availability of a local public boat ramp as an adequate alternative to Turnbow's proposal. The Corps explicitly acknowledged the existence of the boat ramp in its decision document, concluding that this access area was not "functional for the applicant's needs." In light of the Corps' determination of the project's purpose, the boat dock was, at best, an alternative. Our review of the record convinces us that the Corps considered the boat dock, but dismissed it as inadequate.
 
 
 9
 Donahue also argues that to the extent that the Corps did conduct an alternatives analysis, it reached an arbitrary and capricious result. Central to evaluating practicable alternatives is the determination of a project's purpose. Donahue suggests that the project's purpose is to build a residential or "high-end" residential development. See Sylvester v. United States Army Corps of Eng'rs, 882 F.2d 407, 409 (9th Cir.1989) (Sylvester II ) ("an alternative site does not have to accommodate components of a project that are merely incidental to the applicant's basic purpose") (emphasis in original). Donahue relies on decisions by other courts that have rejected attempts by developers to build housing developments and adjacent boat docks on wetlands. In Shoreline Associates v. Marsh, 555 F.Supp. 169 (D.Md.1983), aff'd, 725 F.2d 677 (4th Cir.1984), for example, the court rejected one such attempt, stating that the "primary aspect of the proposed project is the construction of a townhouse community, not the construction of a boat storage facility and launch, which are incidental to it." Id. at 179. Similarly, in Korteweg v. Corps of Engineers of the United States Army, 650 F.Supp. 603, 606 (D.Conn.1986), the court also upheld the denial of a permit for a riverside residential development. Although "the ability to tie one's boat at an adjacent dock would make the [lots] more valuable ..., the docks are neither essential to the [lots] nor are they integral to their residential use." Id. at 605. Thus, each of these courts concluded that the housing project was not water-dependent and applied the regulatory presumption that practicable alternatives exist. Id. at 604; Shoreline, 555 F.Supp. at 179.
 
 
 10
 The Corps, however, began its analysis of Turnbow's application by stating that the planned housing development site was located on uplands and therefore could proceed without a permit. The Corps limited its alternatives analysis to the boat access area. This exclusion of the residential portion of the project led the Corps to conclude that the "project's purpose is to provide boat access to the Missouri River from lots Mr. Turnbow proposes to develop adjacent to the project area." The Corps did not consider the uplands housing development to be part of the project for which Turnbow requested a permit. The project, so defined, is clearly water-dependent. Moreover, insofar as the project contemplated immediate boat access to Turnbow's residential development, it was also site-specific. Turnbow's locating of the planned residential buildings on the surrounding uplands distinguishes this case from both Shoreline and Korteweg, where the developers sought to build their planned residential buildings on the wetlands. Korteweg, 650 F.Supp. at 604; Shoreline, 555 F.Supp. at 171, 179 n. 40. In those cases, the developers could have presumably relocated the entire developments to other locations. Here, the Corps found that Turnbow's development would proceed on the uplands residences even if the Corps denied the permit.
 
 
 11
 The Corps argues that Sylvester v. United States Army Corps of Engineers, 884 F.2d 394 (9th Cir.1989) (Sylvester III ), is more on point. In Sylvester III, the Ninth Circuit reviewed the Corps' grant of a permit to fill eleven acres of wetlands as part of a golf course which itself was part of a larger planned resort. Id. at 396. In assessing the proper scope of the environmental impact under the National Environmental Policy Act, 42 U.S.C. Sec. 4332(2)(c) (1982), the Corps limited its analysis to only the golf course, not the entire resort. Id. at 396. The court upheld the agency's decision, reasoning that it did "not understand how [the developer's] desire to place the course in a meadow that contains wetlands can federalize the entire resort complex." Id. at 401; see Winnebago Tribe of Nebraska v. Ray, 621 F.2d 269, 272-73 (8th Cir.) (limiting scope of NEPA analysis to 1.25 mile segment within Corp's jurisdiction, not entire 67-mile transmission line), cert. denied, 449 U.S. 836, 101 S.Ct. 110, 66 L.Ed.2d 43 (1980). As recognized by the Ninth Circuit, however, the "relationship required to be considered in determining reasonable and practicable alternatives need not be of such significance as would be necessary to 'federalize' the entire project [for NEPA purposes]." Sylvester II, 882 F.2d at 410.
 
 
 12
 Donahue argues that the Corps mistakenly defined the purpose of Turnbow's project. Nonetheless, this court cannot ignore the Corps' interpretation of the Clean Water Act and its accompanying regulations. Chevron, 467 U.S. at 844, 104 S.Ct. at 2782-83; Ford Motor Credit, 444 U.S. at 566, 100 S.Ct. at 797. The Corps found that the project, as modified to include the mitigation site, resulted in little or no net loss to the nation's wetlands. Moreover, the Corps found that Turnbow's uplands housing development would proceed even without the creation of water access. Donahue does not specifically contest either of these findings, and we cannot conclude that they are arbitrary and capricious. In light of these findings, and after conducting a thorough review, the Corps accepted Turnbow's characterization of the overall project as encompassing two severable projects, a conclusion that is not without support. See Louisiana Wildlife Fed'n., Inc. v. York, 603 F.Supp. 518, 528 (W.D.La.1984), aff'd in part and vacated in part, 761 F.2d 1044 (5th Cir.1985) (Corps "must take into account the objectives of the applicant's project"). "Obviously, an applicant cannot define a project in order to preclude the existence of any alternative sites and thus make what is practicable appear impracticable." Sylvester II, 882 F.2d at 409. The cumulative destruction of our nation's wetlands that would result if developers were permitted to artificially constrain the Corps' alternatives analysis by defining the projects' purpose in an overly narrow manner would frustrate the statute and its accompanying regulatory scheme. We do not believe the case before us raises these concerns. Moreover, our standard of review is a limited one. See 5 U.S.C. Sec. 706(2)(a). We conclude that neither the Corps' project definition nor its decision that no practicable alternatives existed was arbitrary and capricious.[4]
 
 
 13
 Accordingly, we affirm.
 
 
 
 *
 The HONORABLE JOHN R. GIBSON was Circuit Judge of the United States Court of Appeals for the Eighth Circuit at the time this case was submitted, and took senior status on January 1, 1994, before the opinion was filed
 
 
 **
 The HONORABLE D. BROOK BARTLETT, United States District Judge for the Western District of Missouri, sitting by designation
 
 
 [1]
 The Honorable Patrick A. Conmy, United States District Judge for the District of North Dakota
 
 
 [2]
 The National Wildlife Federation does not appeal from the district court's judgment
 
 
 [3]
 As defined by regulation:
 The term wetlands means those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs, and similar areas.
 
 
 [33]
 C.F.R. Sec. 328.3(b) (1993) (emphasis in original)
 
 
 [4]
 We need not consider whether the Corps could reach the same result when a developer's interest in an overall residential development hinged on the development of the wetlands portion. See Korteweg, 650 F.Supp. at 604; Shoreline, 555 F.Supp. at 179. Nor need we analyze the degree to which the availability of "practicable alternatives" depends on the particular harm a project poses to the wetlands. These issues await another day