OZARK SOCIETY; Arkansas Canoe Club; Sierra Club; National Parks Conservation Association; American Rivers; Save Our Streams; Arkansas Wildlife Federation; Federation of Fly Fishers; Arkansas Chapter of the American Fisheries Society, Plaintiffs

v.

David F. MELCHER, Brigadier General, United States Army Corps of Engineers; Thomas E. White, Secretary of the Army; United States Army Corps of Engineers, Defendants

No. 4:01CV00732 WRW.

United States District Court, E.D. Arkansas, Western Division.

Oct. 18, 2002.

Joseph Henry Bates, III, McMath, Vehik, Drummond, Harrison & Ledbetter, P.A., Little Rock, AR, Peter M.K. Frost, Western Environmental LAw Center, Eugene, OR, for Plaintiffs.

Richard M. Pence, Jr., U.S. Atty's Office EAstern District of Ark., Little Rock, AR, Caroline M. Blanco, Wendy L. Blake, U.S. Dept. of Justice Environment & Natural Resources Div., Washington, DC, for Defendants.

## ORDER

WILSON, District Judge.

Pending is Defendants' Motion to Dismiss (doc. no. 13). Many of the pleadings filed in opposition to the motion to dismiss refer to documents in the Administrative Record and the Supplemental Administrative Record. The documents comprising the Supplemental Administrative Record were filed by Plaintiffs on July 24, 2002, as attached to the Second Declaration of Peter M.K. Frost (doc. no. 25). Defendants' counsel filed a Notice of Filing of Administrative Record (doc. no. 20) on May 24, 2002. Attached to that document was an index describing the contents of the Administrative Record. However, the actual Administrative Record has never been filed.

Although I generally permit oral argument when requested, I don't believe it would help with regard to the pending motion to dismiss. Therefore, Plaintiffs' request for oral argument is DENIED.

## I. Background

In July, 1997, the Searcy County Regional Water District ("Searcy County") submitted an application to Defendants ("Corps") for a section 404 Clean Water Act permit. Searcy County requested authorization to place dredge and fill material into a portion of Bear Creek, a tributary to the Buffalo National River, for the purpose of constructing a dam and water supply reservoir. The Bear Creek Dam would be about 700 feet long and 107 feet high and form a 92.5 acre reservoir, converting approximately 13,000 feet of streambed to a reservoir. The proposed site for the dam lies approximately twenty-six miles upstream from the confluence of Bear Creek and the Buffalo National River.

In October, 1999, the U.S. Department of the Interior, through the Regional Director of the National Park Service ("NPS"), wrote to the Corps' District Engineer, asking the Corps to hold in abeyance consideration of the permit application filed by Searcy County until NPS could determine, in accordance with the requirements of the Buffalo National River enabling legislation at 16 U.S.C. § 460m–11, whether the permit would result in

"hydrological and ecological changes of such magnitude as to unreasonably diminish the scenic, recreational, and fish and wildlife values present in the Buffalo National River at the time of its establishment."[1] In December, 1999, the Corps replied to the Regional Director of NPS, confirming that it did not anticipate holding its decision on the permit application in abeyance pending the Department of the Interior's determination under 16 U.S.C. § 460m–11.[2]

In May, 2000, the Corps released an Environmental Assessment ("EA") under the National Environmental Policy Act ("NEPA"), discussing the impact of the proposed Bear Creek Dam and alternatives to it. One alternative considered in the EA was the "Clinton–Marshall Pipeline," which would channel water through a thirty-seven mile pipeline from an existing dam that creates Greers Ferry Lake. The Corps of Engineers Little Rock District ("Little Rock District") found that no permit should be issued for the dam because the pipeline was a practicable alternative that would have less environmentally-damaging impact than the dam. Searcy County appealed the denial of its permit application to the Southwest Division of the Corps of Engineers in Texas ("Southwest Division"). On November 9, 2000, the Southwest Division vacated the denial of the permit and remanded the matter, instructing the Little Rock District to re-evaluate the environmental impact of the dam and pipeline, along with the projected costs of each alternative. Upon reevalua-

tion, the Little Rock District again recommended denial of Searcy County's permit application, finding that the dam would clearly have more permanent adverse impact than the pipeline and would result in a monthly cost to water consumers of approximately four dollars more than water delivered via the pipeline. However, on August 3, 2001, the Southwest Division issued an "Environmental Assessment and Statement of Findings," disagreeing with the Little Rock Division's findings on costs and environmental impact of the two alternatives and granting Searcy County's permit application.[3]

Plaintiffs Ozark Society, et al. ("Ozark Society"), filed a Complaint in this case on October 24, 2001, and an Amended Complaint (doc. no. 5) on February 11, 2002. The nine Plaintiffs in this case assert similar interests and injuries.[4] Plaintiff Ozark Society's principal mission is the preservation of wild and scenic rivers, wilderness, and unique natural areas; its members often visit, use, and enjoy Bear Creek and the Buffalo National River. Plaintiff Arkansas Canoe Club fosters and promotes the interests of people who find recreation in paddling canoes and other similar watercraft and acts to preserve the wilderness character of waterways; its members paddle the Buffalo National River and its tributaries hundreds of times each year and fish Bear Creek and the Buffalo National River. Plaintiff Sierra Club works on behalf of the public interest to protect, preserve, and enhance Arkansas's

1. October 15, 1999 Letter, attached as Exhibit A to Peter M.K. Frost Declaration (doc. no. 18).

2. See December 21, 1999 Letter, attached as Exhibit D to Peter M.K. Frost Declaration (doc. no. 18).

3. Once the permit was granted, Searcy County promptly sought and received financing for the project. In September, 2001, the County obtained a loan from the Arkansas Soil and Water Conservation Commission, repayment of which was dependent upon the dam being constructed pursuant to approval of a county-wide sales tax to finance the construction loan. Supplemental Administrative Record (doc. no. 25) at 11–13.

4. See Amended Complaint (doc. no. 5) at 2–5.

waters; its members fish, swim, and engage in recreation in the Buffalo National River and observe flora and fauna species in the area. Plaintiff National Parks Conservation Association's purpose is protecting and preserving the National Park System, including the Buffalo National River; it has approximately 2,250 members in Arkansas. Plaintiff American Rivers is dedicated to preserving and restoring America's rivers and promoting public awareness about the importance of healthy rivers. Plaintiff Save Our Streams is dedicated to preserving endangered streams in Arkansas; its members paddle and fish the Buffalo National River and engage in recreation in the Bear Creek watershed. Plaintiff Arkansas Wildlife Federation's mission is to promote conservation, responsible management and sustainable use of Arkansas's fish and wildlife habitat, natural resources, and outdoor recreational opportunities; its members paddle and fish the Buffalo and engage in recreation in the Bear Creek watershed. Plaintiff Federation of Fly Fishers uses and enjoys Bear Creek and the Buffalo National River for fishing and other recreational activities. Plaintiff Arkansas Chapter of the American Fisheries Society promotes the wise management, conservation, and use of the fishery and aquatic resources of Arkansas; many chapter members regularly fish and float the Buffalo National River and its tributaries.

In the Amended Compliant, Ozark Society states that Bear Creek is a major tributary of the Buffalo National River, comprising roughly ten percent of the Buffalo National River's drainage. Ozark Society alleges that its members often visit, use, and enjoy Bear Creek and the Buffalo National River, and challenges the Corps' issuance of a permit to authorize or allow the construction of a dam on Bear Creek. Plaintiffs maintain that the authorization for construction of the dam will adversely affect them by depleting the free-flow of water in the rivers, degrading the water quality, harming fish and wildlife and their habitat, and depriving Plaintiffs their right to be apprised of and influence agency decisions concerning the environmental impact of the proposed dam. Plaintiffs also assert procedural harm.

First, Ozark Society claims that the Corps violated the Buffalo National River enabling legislation, 16 U.S.C. §§ 460m–8 et seq., by issuing the permit prior to a determination by the Secretary of the Interior that the dam would not (a) have a direct and adverse effect on the values for which the Buffalo River was established, or (b) unreasonably diminish the scenic, recreational, and fish and wildlife values of the Buffalo National River. Second, Ozark Society claims the Corps violated NEPA, 42 U.S.C. §§ 4331 et seq., because its assessments of the proposed dam's environmental impact were deficient. Ozark Society also alleges that issuance of the permit for the dam constitutes a major federal action significantly affecting the environment and, thus, claims that the Corps violated NEPA, 42 U.S.C. § 4332(2)(c), when it failed to prepare an Environmental Impact Statement ("EIS"). Finally, Ozark Society claims the Corps violated the Federal Water Pollution Prevention and Control Act ("Clean Water Act"), 33 U.S.C. § 1344(b)(1),[5] when it issued a permit to build the dam even though a practicable alternative existed that would supply presumed water needs and have a less adverse impact on the aquatic ecosystem.

Ozark Society asserts that all of its claims are reviewable under the Administrative Procedure Act ("APA"), and asks

5. See also 40 C.F.R. § 230.10(a).

this court, under 5 U.S.C. § 706(2)(A), to hold the Corps' actions unlawful and set them aside as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." They claim the Corps violated the APA by: (1) issuing the permit prior to and without a determination by the Secretary of the Interior that the dam would not have a direct and adverse effect, and would not unreasonably diminish the scenic, recreational, and fish and wildlife values of the Buffalo National River; (2) issuing the permit even though the dam will have a direct and adverse effect and will unreasonably diminish the scenic, recreational, and fish and wildlife values of the Buffalo National River; (3) preparing a deficient EA, and failing to prepare an EIS; and (4) issuing the permit despite the existence of a practicable and less damaging alternative. Relying on all the above, Ozark Society asks this court to vacate the permit issued to Searcy County.

Subsequent to the filing of this lawsuit, on April 25, 2002, NPS wrote the Corps, stating that new information exists on the hydrologic characteristics of Bear Creek, listing additional studies that NPS is currently conducting which are necessary to determine the impact of the dam on the Buffalo National River, and re-stating its position that the Secretary of the Interior must make a determination under the Buffalo National River enabling legislation before work can begin on the dam and reservoir project.[6] The following day, the Bureau of Land Management ("BLM") wrote the Corps stating that it owns lands (the Bear Creek Tract) which will be needed as buffer lands or as part of the reservoir for the project. BLM informed the Corps that it would not convey its lands to Searcy County until after NPS determines the impact of the dam.[7] On April 29, 2002, the Corps wrote Searcy County, reminding the County of the conditions placed on its permit and acknowledging the positions of NPS and BLM that, in order to meet the conditions of the permit, the County must await a final determination by the Department of the Interior under the Buffalo National River enabling legislation before beginning construction under the permit.

 On May 8, 2002, Defendants filed a Motion to Dismiss (doc. no. 13) and supporting memorandum, asking this court to dismiss Plaintiffs' Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1). Rule 12(b)(1) provides for dismissal of a claim where the court lacks jurisdiction over the subject matter of the claim. A court deciding a motion under Rule 12(b)(1) must distinguish between a "facial attack" and a "factual attack."[8] Facial challenges are those limited to the allegations in the plaintiff's complaint.[9] They require the court merely to determine whether the plaintiff has sufficiently alleged a basis of subject matter jurisdiction.[10] The allegations in the complaint are taken as true for the purposes of the motion.[11] A "factual attack," however, challenges the existence of subject matter jurisdiction in fact, irrespective of the pleadings.[12] At issue is the court's power

---

**6.** Supplemental Administrative Record at 1–3.

**7.** Supplemental Administrative Record at 7.

**8.** *See Osborn v. United States,* 918 F.2d 724, 729 n. 6 (8th Cir.1990).

**9.** *See BP Chemicals Ltd. v. Jiangsu Sopo Corp.,* 285 F.3d 677, 680 (8th Cir.2002).

**10.** *Menchaca v. Chrysler Credit Corp.,* 613 F.2d 507, 511 (5th Cir.1980) (citing *Mortensen v. First Federal Savings & Loan Ass'n,* 549 F.2d 884, 891 (3d Cir.1977)).

**11.** *Id.*

**12.** *Id.*

to hear the case, and the court is free to weigh evidence and satisfy itself as to its power to hear the case.[13] In a factual attack, the court may consider matters outside the pleadings, such as testimony and affidavits, and no presumptive truthfulness attaches to the plaintiff's allegations.[14] Moreover, the plaintiff bears the burden of proving that jurisdiction exists.[15]

Here, the Corps launches a factual attack on the existence of subject matter jurisdiction. The Corps' motion states three reasons why this court allegedly lacks jurisdiction over Plaintiffs' claims: (1) there is no final agency action;[16] (2) Plaintiffs' claims are not ripe; and (3) Plaintiffs lack standing. Plaintiffs respond that this court clearly has jurisdiction to issue a declaratory judgment that the Corps violated federal law when it prematurely issued the permit authorizing construction of the dam.

## II. Justiciability

Under the APA at 5 U.S.C. § 702, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." Section 704 of the APA states that both an agency action made reviewable by statute and a final agency action for which there is no other adequate remedy in a court are subject to judicial review. A permit is final when: (1) the action marks the consummation of the agency's decisionmaking process (i.e., is not of merely tentative or interlocutory nature); and (2) the action is one by which rights or obligations have been determined

or from which legal consequences will flow.[17]

### A. Final Agency Action

The Corps' first claim is that its issuance of the permit does not constitute final agency action because the permit is subject to certain significant conditions which will require the approval of the Corps and other federal agencies (i.e., NPS and BLM) and the permit can be revoked if permit conditions are not satisfied. Some permit conditions that must be met prior to beginning construction are: (1) Searcy County, in conjunction with the U.S. Fish and Wildlife Service, the Arkansas Department of Environmental Quality, and the Arkansas Game and Fish Commission, must prepare a reservoir mitigation plan and submit that plan to the Little Rock District for review and approval; (2) the mitigation plan must include, among other things, a 300 foot forested buffer maintained above the 200 foot cleared buffer around the reservoir (land owned by BLM); (3) Searcy County must develop and implement a release plan to minimize adverse impact to the flow regime of Bear Creek downstream from the dam, which must be reviewed and approved by the Corps and the Arkansas Department of Environmental Quality; (4) Searcy County must submit a detailed erosion plan for the approval of the Little Rock District prior to each construction phase of the project; (5) Searcy County must perform a Phase 1 cultural resources survey for any areas that would be impacted by the project that were not previously surveyed and must

---

13. *Titus v. Sullivan,* 4 F.3d 590 (8th Cir. 1993).

14. *Osborn v. United States,* 918 F.2d at 729–30.

15. *Mortensen v. First Federal Savings & Loan Ass'n,* 549 F.2d 884, 892 (3d Cir.1977).

16. In their Reply Memorandum, Defendants assert that the court need not reach the previously raised issue of final agency action "in light of the clear lack of ripeness and standing."

17. *Bennett v. Spear,* 520 U.S. 154, 177–78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997).

submit the survey to the Little Rock District for approval prior to beginning construction.[18] According to the Corps, unless *all* of these conditions have been met, there can be no Project construction and, hence, no final agency action. The Corps asserts that, if the conditions are not met, the permit will be revoked and the dam will not be built, and suggests that, until construction on the dam begins, there will be no final agency action.

Ozark Society maintains that the issuance of the permit does constitute final agency action. They first point out that the Corps has cited no case that directly supports its theory that conditions existing within the permit deprive the permit of the status of a final agency action. Ozark Society asserts that, as a predicate to issuing the permit, the Corps finally determined that it had the legal authority to issue such a permit without consulting the Secretary of the Interior under the Buffalo National River enabling legislation. Next, Ozark Society claims there is final agency action under NEPA because the Corps issued a final decision document, prepared a final EA, and made a final determination that an EIS is not required. They also claim there is final agency action under the Clean Water Act because a predicate to issuance of the permit was the final decision by the Southwest Division of the Corps that the proposed pipeline was not a practicable alternative to the dam. Ozark Society argues that legal consequences will flow from the Corps' actions and that those actions have prompted reliance and actions by third parties in moving toward construction of the dam.

■ Regulations provide that the Corps' initial decision to issue or deny a permit is the Corps' final decision on a permit application.[19] For an appealed action, where the division engineer determines that the appeal has merit, the final Corps permit decision is the district engineer's decision pursuant to the division engineer's remand.[20] In addition, several courts have found that the Corps' issuing of dredge and fill permits, as well as other permits, constitutes final agency action.[21] Furthermore, the Eighth Circuit has reviewed permits issued under section 404 although those permits contain terms or conditions that must be met before construction may begin.[22] I find that the Corps' issuance of

---

18. Department of the Army Permit at 2–3, attached as Exhibit 1 to Harris Declaration (filed with doc. no. 14).

19. 33 C.F.R. § 331.10.

20. *Id.*

21. *See, e.g., Bankers Life & Cas. Co. v. Callaway*, 530 F.2d 625, 632 (5th Cir.1976) (finding a dredge and fill permit to constitute final agency action by the Corps in the sense that it is a firm adoption of a position); *Citizens Comm. for the Hudson Valley v. Volpe*, 425 F.2d 97, 102 (2d Cir.1970) (finding that Corps' issuance of dredge and fill permit was final agency action for which there was no other adequate remedy in court). *Compare Broadened Horizons Riverkeepers v. U.S. Army Corps of Engineers*, 8 F.Supp.2d 730 (E.D.Tenn.1998) (finding that final agency action triggering limitations period commenced on date Corps' permits were issued or modi-

fied); *Florida Keys Citizens Coalition, Inc. v. West*, 996 F.Supp. 1254 (S.D.Fla.1998) (allowing review of claim that Corps' permits were issued in violation of applicable guidelines); *Citizens for Clean Air, Inc. v. Corps of Engineers*, 349 F.Supp. 696 (S.D.N.Y.1972) (finding that failure of Corps to evaluate environmental impact of its permit under NEPA rendered permit invalid).

22. *See National Wildlife Federation v. Whistler*, 27 F.3d 1341 (8th Cir.1994) (reviewing the Corps' issuance of a permit under section 404(b) of the Clean Water Act that contained 42 conditions); *Sierra Club v. U.S. Army Corps of Engineers*, 771 F.2d 409 (8th Cir.1985) (reviewing the Corps' issuance of a permit under section 10 of the Rivers and Harbors Appropriation Act which included conditions).

the permit, albeit conditional, constitutes final, reviewable agency action.

## B. Standing

■■■■■ A federal court's jurisdiction can be invoked only when the plaintiff has suffered some threatened or actual injury resulting from the putatively illegal action.[23] The constitutional doctrine of standing requires a plaintiff to allege " 'such a personal stake in the outcome of the controversy' as to warrant his invocation of federal court jurisdiction and to justify the exercise of the court's remedial powers on his behalf." [24] The "irreducible constitutional minimum of standing contains three elements": (1) the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, rather than conjectural or hypothetical; [25] (2) there must be a causal connection between the injury and the conduct complained of (i.e., the injury must be fairly traceable to the challenged action of the defendant, rather than the action of a third party not before the court); and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.[26] The party invoking federal jurisdiction bears the burden of establishing these elements.[27] At the pleading stage, general factual allegations of injury resulting from Defendants' conduct may suffice.[28]

■■■■■ Standing, to obtain judicial review of federal agency action under Section 10 of the APA, 5 U.S.C. § 702, is present where the plaintiffs allege that the challenged action of the defendant caused them injury in fact, and where that alleged injury was to an interest " 'arguably within the zone of interests to be protected or regulated' by the statutes that the agencies were claimed to have violated." [29] The injury-in-fact inquiry requires the party seeking review to be among the injured.[30]

The Corps contends that Ozark Society has failed to establish an actual or imminent injury in fact. It argues that the dam cannot be constructed until at least 2005, as NPS will not complete its determination on the effects of the proposed dam until then. It claims that, "without knowing the outcome of the future decisions that must be made by NPS, BLM, and the Corps to meet the conditions of the permit, Plaintiffs' allegations of harm . . . are conjectural and hypothetical-not actual as is required by the test." If the permit is revoked, according to the Corps, Ozark Society will not be injured. Plaintiffs contend they are presently injured by the Corps' procedural violations of the

23. *Warth v. Seldin*, 422 U.S. 490, 498–99, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973)).

24. *Id.* (quoting *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)).

25. A party must make an adequate showing that the injury is actual or certain to ensue; assertions of potential future injury will not satisfy the injury-in-fact requirement. *Sierra Club v. Robertson*, 28 F.3d 753 (8th Cir.1994). A threatened injury must be "certainly impending" to constitute an injury-in-fact. *Whitmore v. Arkansas*, 495 U.S. 149, 110 S.Ct.

1717, 109 L.Ed.2d 135 (1990) (quoting *Babbitt v. United Farm Workers*, 442 U.S. 289, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979)).

26. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citations omitted).

27. *Id.* at 561, 112 S.Ct. 2130.

28. *See id.*

29. *Sierra Club v. Morton*, 405 U.S. 727, 733, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

30. *Id.* at 735, 92 S.Ct. 1361.

Buffalo National River enabling legislation, NEPA, and the Clean Water Act.

The Supreme Court has consistently held that a plaintiff does not state an Article III case or controversy where he raises only a "generally available grievance about government-claiming only harm to his and every citizen's interest in the proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large." [31] Where a plaintiff is seeking to enforce a procedural requirement, however, the Court has suggested that he has adequately shown injury in fact when he has shown that the disregard of that requirement could impair a separate, concrete interest of his *e.g.*, "the procedural requirement for an environmental impact statement before a federal facility is constructed next door to [him]." [32] In a footnote to *Lujan v. Defenders of Wildlife*, the Court noted that the requirements for standing are lessened where a plaintiff is challenging a procedural right:

> The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy. Thus, under our case law, one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the state-

ment will cause the license to be withheld or altered, and even though the dam will not be completed for many years. [33]

The Court distinguished "persons who have no concrete interests affected—persons who live (and propose to live) at the other end of the country from the dam." [34]

The Supreme Court has recognized that "[a]esthetic and environmental well-being ... are important ingredients of the quality of life in our society, and the fact that particular environmental interests are shared by the many rather than the few does not make them less deserving of legal protection through the judicial process." [35] Recently, the Supreme Court held that "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." [36] Other circuits have recognized that statutes can afford plaintiffs a legally protected interest in environmental resources, such that they gain standing to obtain judicial review of agency action alleged to be in contravention of the public interest. [37]

Plaintiffs in this case allege that they have a long and extensive record of hard work to protect the Buffalo National River. They aver that they often visit the Buffalo National River and that their members' recreational and aesthetic interests will be harmed by the building of the proposed

---

**31.** *Lujan v. Defenders of Wildlife*, 504 U.S. at 573–74, 112 S.Ct. 2130.

**32.** *Id.* at 572, 112 S.Ct. 2130.

**33.** *Id.* at 573 n. 7, 112 S.Ct. 2130.

**34.** *Id.*

**35.** *Morton*, 405 U.S. at 734, 92 S.Ct. 1361.

**36.** *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 183, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (quoting *Sierra Club v. Morton*, 405 U.S. at 735, 92 S.Ct. 1361 (1972)).

**37.** *See West Virginia Highlands Conservancy v. Island Creek Coal Co.*, 441 F.2d 232, 234 (4th Cir.1971); *Citizens Comm. for the Hudson Valley v. Volpe*, 425 F.2d 97, 105 (2d Cir. 1970).

dam. Though construction of the dam is not yet imminent, Plaintiffs claim they are presently injured by the Corps' procedural violations in relation to the dam. Ozark Society claims that the Buffalo National River enabling legislation requires the Corps to await a determination by the Secretary of the Interior prior to issuing the permit, and they assert that the failure to await such a determination violates the procedural requirements of the Act. The Buffalo National River enabling legislation states, in relevant part:

[N]o department or agency of the United States shall assist by loan, grant, license, or otherwise in the construction of any water resources project that would have a direct and adverse effect on the values for which such river is established, as determined by the Secretary.[38]

Clearly, the Corps did not await a determination by the Department of the Interior before issuing the permit to Searcy County. In an April 29, 2002 letter, the Corps informed Searcy County that it could not begin construction on the dam until NPS completed its environmental determination and unless the study indicates that the dam will not adversely effect Buffalo National River.

■ Due to the fact that construction of the dam is still contingent, there is a question in my mind whether Ozark Society has shown imminent harm with regard to the actual construction of the dam. However, I find that Ozark Society has clearly shown sufficient injury to meet the procedural harm test. They are persons who frequently use and enjoy Bear Creek and the Buffalo National River and they claim that the Corps' disregard of the Buf-

falo National River enabling legislation prevents the Department of the Interior from ensuring that the proposed dam will not have an adverse effect on the Buffalo National River. Thus, I find that Ozark Society has shown injury in fact sufficient to support standing to challenge the Corps' compliance with the Buffalo National River enabling legislation.

Next, Ozark Society asserts they are presently harmed by the Corps' alleged procedural violation of NEPA in that they have been denied the right to comment on and influence the Corps' decisions related to the dam. They contend that the EA prepared by the Corps' was deficient and that the Corps violated NEPA when it found that the dam would have no significant impact on the environment such that an EIS would not be required. Stewart Noland, President of the Ozark Society, stated that the Ozark Society submitted comments to the Corps asking that an EIS be completed under NEPA prior to issuance of the permit for the dam.[39]

■ Other courts have found: (1) that plaintiffs have standing to assert NEPA violations where they state they intend to use and enjoy lands that they believe would be affected by government regulations;[40] and (2) that procedural failures in EIS preparation provide sufficient "injury in fact" to support standing because they create a risk that environmental impacts will be overlooked.[41] Implicit in Ozark Society's allegations of procedural injury is the creation of a risk that harm to Bear Creek and the surrounding environment may be overlooked by the Corps' allegedly deficient EA and its failure to prepare an EIS. I find that Ozark Society's allegations

---

**38.** 16 U.S.C. § 460m–11.

**39.** Affidavit of Stewart Noland at 1–2 (doc. no. 24).

**40.** *Heartwood, Inc. v. United States Forest Service,* 230 F.3d 947, 952 (7th Cir.2000).

**41.** *Oregon Envtl. Council v. Kunzman,* 817 F.2d 484, 491 (9th Cir.1987).

constitute sufficient injury in fact to support Ozark Society's standing to challenge the Corps' compliance with NEPA procedure.

■ Finally, Ozark Society contends they are injured under the Clean Water Act because the Corps' has made a final decision that the proposed pipeline is not a practicable alternative to the proposed dam. Guidelines in force under the Clean Water Act require that,

[e]xcept as provided under · section 404(b)(2), no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences.[42]

By issuing the permit allowing the discharge of dredge or fill material for construction of the dam, the Corps has impliedly determined that there is no practicable alternative to the dam. Ozark Society alleges that the Corps' decision to permit construction of the dam, rather than require use of the proposed pipeline, will have an adverse effect on Bear Creek and the Buffalo National River. Again, I find that Ozark Society's allegations that the Corps failed to correctly follow the procedures designed to ensure that the environmental consequences the dam are adequately evaluated constitute sufficient injury in fact to support standing for Ozark Society's challenge to the permit under the Clean Water Act.

■ The Corps also challenges Ozark Society's standing on the basis of redressability, asserting that, because of the speculative nature of Ozark Society's claims, it would be hard for this court to fashion a remedy. Ozark Society maintains that this court has the ability to address their harm, pointing to the court's authority under 28 U.S.C. §§ 2201–2202 to issue a declaratory judgment. The APA specifically provides that this court "shall" set aside agency action, findings, or conclusions where they are found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.[43] I have authority to set aside agency action, findings, or conclusions under the APA. Such a ruling would presumably address the harms alleged to be suffered by Ozark Society. Thus, Plaintiffs' claims are redressable by this court.

## C. Ripeness

The Corps' final contention is that Ozark Society's claims are not ripe because the society is seeking judicial intervention prior to the time when construction of the dam is finally authorized. The Corps asserts that Ozark Society's claims will not be fit for judicial review until all of the permit conditions are met, pointing out that the conditions require further approval by the Corps and other entities before construction on the dam can begin. According to the Corps, if the NPS makes a negative determination under the Buffalo National River enabling legislation, the Corps plans to initiate procedures to revoke the permit.[44] The Corps further contends that Ozark Society will not suffer any hardship if judicial review of their claims is withheld at this time, asserting there will be no direct and immediate impact on Ozark Society until the permit

---

**42.** 40 C.F.R. § 230.10(a).

**43.** 5 U.S.C. § 706(2)(A). *See also Save Greers Ferry Lake, Inc. v. Department of Defense,* 255 F.3d 498, 501 (8th Cir.2001).

**44.** Harris Declaration at ¶ 12 (filed with doc. no. 14).

conditions are met in the year 2005 or later.[45]

■ The basic rationale of the ripeness doctrine is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." [46] The problem requires a court to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.[47]

> Factors to consider in determining whether an issue is ripe for judicial relief in the administrative context are whether: (1) the issues presented are purely legal, (2) the issues are based on final agency action, (3) the controversy has a direct and immediate impact on the plaintiff's business, and (4) the litigation is calculated to expedite final resolution rather than delay or impede effective agency enforcement.[48]

The Corps cites *Vogel v. Foth and Van-Dyke Assoc., Inc.*[49] where the Eighth Circuit distinguished between a "contingent harm" and a "current injury." In that case, the Court noted that the plaintiffs:

> do not allege that the landfill, if sited next to their property, might produce harm; they claim the announcement of the neighboring land as a potential site has directly and immediately harmed

them by making their property less valuable for development and by driving away potential purchasers. The touchstone of a ripeness inquiry is whether the harm asserted has "matured enough to warrant judicial intervention." [Citation omitted.] [50]

The Supreme Court has noted that, because NEPA guarantees a particular procedure, "a person with standing who is injured by a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes place, for the claim can never get riper." [51] The Buffalo National River enabling legislation and the Clean Water Act likewise guarantee a particular procedure, namely adequate consideration of environmental consequences. Ozark Society claims that rights and obligations have been determined and that legal consequences flow from both the Corps' permit and final NEPA document. They point to the case of *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989), where the Supreme Court observed that

> The statutory requirement that a federal agency contemplating a major action prepare such an environmental impact statement ... ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience

---

**45.** *See* National Park Service letter of April 25, 2002, attached as Exhibit 2 to Harris Declaration (filed with doc. no. 14).

**46.** *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), *overruled on other grounds, Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977).

**47.** *Id.* at 149, 87 S.Ct. 1507.

**48.** *Lane v. United States Dept. Of Agriculture*, 187 F.3d 793, 795 (8th Cir.1999).

**49.** 266 F.3d 838, 840 (8th Cir.2001).

**50.** *Vogel v. Foth and VanDyke Assoc., Inc.*, 266 F.3d 838, 840 (8th Cir.2001).

**51.** *Ohio Forestry Assoc., Inc. v. Sierra Club*, 523 U.S. 726, 737, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998).

that may also play a role in both the decisionmaking process and the implementation of that decision.... Simply by focusing the agency's attention on the environmental consequences of a proposed project, NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast.[52]

Other courts have found NEPA challenges to the adequacy of EA and EIS documents to be ripe for review.[53]

■■■ The issues presented by Ozark Society involve the purely legal questions of statutory requirements. Final agency action is at issue, the procedural harm alleged by Plaintiffs is a present harm, and litigation will expedite final resolutions on the legality of the Bear Creek Dam. I find that the Corps' alleged failure to comply with the Buffalo National River enabling legislation, NEPA, and the Clean Water Act will never be any more ripe than here and now.

## III. Conclusion

Considering all the above, I find that both the permit for Bear Creek Dam and the Corps' final NEPA document constitute final, reviewable agency action. Ozark Society has standing, and the issues before me are ripe for determination. Consequently, the Corps' motion to dismiss is DENIED.

---

**52.** *Robertson v. Methow Valley Citizens Council,* 490 U.S. at 349, 109 S.Ct. 1835.

**53.** *See, e.g., Kern v. United States Bureau of Land Mgmt.,* 284 F.3d 1062, 1070 (9th Cir. 2002).