**OZARK SOCIETY; Arkansas Canoe Club; Sierra Club; National Parks Conservation Association; American Rivers; Save Our Streams; Arkansas Wildlife Federation; Federation of Fly Fishers; Arkansas Chapter of the American Fisheries Society, Plaintiffs,**

v.

**David F. MELCHER, Brigadier General, United States Army Corps of Engineers; Thomas E. White, Secretary of the Army; United States Army Corps of Engineers, Defendants.**

No. 4:01 CV 00732 WRW.

United States District Court,
E.D. Arkansas,
Western Division.

March 4, 2003.

Caroline M. Blanco, United States Department of Justice, Environment and Natural Resources, General Litigation Section, Wendy L. Blake, United States Department of Justice, Environment and Natural Resources, Environmental Defense Section, Washington, D.C., H.E. "Bud" Cummins, United States Attorney, Eastern District of Arkansas, Richard M. Pence, Jr., Assistant United States Attorney, Little Rock, AR, for Defendants.

Peter M.K. Frost, Western Environmental Law Center, Eugene, OR, Hank Bates, McMath Woods, P.A., Little Rock, AR, for Plaintiffs.

## SUMMARY JUDGMENT ORDER

WILSON, District Judge.

Pending is Plaintiffs' Motion for Partial Summary Judgment (doc. no. 26), in which they ask me to declare that the Corps violated the Buffalo National River enabling legislation when it issued a permit to build the Bear Creek dam without awaiting a determination by the Secretary of the Interior.[1] I heard oral argument on this motion on January 28, 2003.

As I provided a detailed background of this case in my Order denying the Defendants' Motion to Dismiss,[2] I will set out only limited and updated facts in this Order. For summary-judgment purposes, I find there are no material facts in dispute. For the reasons set forth below, I find that the Plaintiffs' summary-judgment motion became moot when the Corps revoked the permit authorizing Searcy County to build a dam on Bear Creek.

## I. Background

The Buffalo National River originates in the Boston Mountain region of Arkansas and flows eastward along a winding course to its confluence with the White River.[3] No major reservoirs currently affect the free flow of the river.[4] Bear Creek is a tributary of the Buffalo National River, located in the Ozark Mountains.[5] During some seasons, Bear Creek makes up over ten percent of the flow in the Buffalo at its confluence with the river.[6]

In July, 1997, the Searcy County Regional Water District ("Searcy County") submitted an application to Defendants ("Corps") for a section 404 Clean Water Act permit. Searcy County requested authorization to place dredge and fill material into a portion of Bear Creek, a tributary to the Buffalo National River, for the purpose of constructing a dam and water supply reservoir. The proposed site for the dam lies approximately twenty-six miles upstream from the confluence of Bear Creek and the Buffalo National River.[7] The proposed dam was to form a 92.5 acre reservoir, converting approximately 13,000 feet of streambed to a reservoir.[8] The reservoir would cause a withdrawal of 3.7 million gallons of water per day, or ap-

---

1. The Complaint in this case also contains a request that I declare that the Corps violated NEPA and the Clean Water Act; however, neither of these claims are addressed in the summary-judgment motion.

2. *Ozark Society v. Melcher*, 229 F.Supp.2d 896 (E.D.Ark.2002).

3. Administrative Record ("AR") at 662.

4. AR at 420.

5. Supplemental Administrative Record ("SAR") at 2.

6. AR at 1665.

7. AR at 2241.

8. AR at 2190.

proximately 5.7 cubic feet per second, from Bear Creek.[9]

On August 3, 2001, the Southwestern Division of the Army Corps of Engineers ("Southwestern Division") granted Searcy County's permit application. Following that decision, Plaintiffs filed this lawsuit.

On April 25, 2002, the National Park Service ("NPS") wrote the Corps, stating its belief that, before work could begin on the dam and reservoir project, the Secretary of the Interior was required to make a determination under the Buffalo National River enabling legislation as to the impact that the proposed dam would have on the Buffalo National River.[10] On April 29, 2002, the Corps wrote Searcy County, acknowledging the positions of the NPS and the Bureau of Land Management that the County was required to await the Department of the Interior's final determination under the Buffalo National River legislation before construction could begin on the dam.

In their Motion for Partial Summary Judgment, Plaintiffs seek a declaration that Defendants violated the Buffalo National River legislation[11] when they issued the permit for the Bear Creek dam before a determination by the Secretary of the Interior as to the potential impact of the dam on the Buffalo National River. As of this date, the Secretary of the Interior has not determined the impact that the proposed dam might have on the river.[12] NPS is currently conducting the additional studies necessary to determine that impact.[13]

On October 18, 2002, I denied Defendants' Motion to Dismiss and held that Plaintiffs could proceed with this lawsuit.

I found that Plaintiffs had procedural standing:

I find that Ozark Society has clearly shown sufficient injury to meet the procedural harm test. They are persons who frequently use and enjoy Bear Creek and the Buffalo National River and they claim that the Corps' disregard of the Buffalo National River enabling legislation prevents the Department of the Interior from ensuring that the proposed dam will not have an adverse effect on the Buffalo National River. Thus, I find that Ozark Society has shown injury in fact sufficient to support standing to challenge the Corps' compliance with the Buffalo National River enabling legislation.[14]

Following my decision, Defendants filed a Response to Plaintiffs' Motion for Partial Summary Judgment, accompanied by the Declaration of Patsy M. Knight and a copy of a November 20, 2002 letter from the Southwestern Division of the Corps (to the President of Searcy County's Regional Water District) suspending the permit. That letter states, in relevant part:

This is in reference to DA Permit 13861 issued to Searcy County Rural Water District for the construction of a dam and reservoir on Bear Creek.

\*   \*   \*   \*   \*   \*

Representatives of the Department of Interior have met with the Corps and the Department of Justice several times to settle the disagreement between the Corps and the National Park Service on the meaning of [the Buffalo National River Enabling Act, 16 U.S.C. § 460m–8]. As a result, the Department of Justice, on behalf of the Administration, has

9.  AR at 1665.

10. SAR at 1–3.

11. 16 U.S.C. § 460m–11.

12. SAR at 3.

13. SAR at 1–3.

14. *Ozark Society*, 229 F.Supp.2d at 907.

decided that receipt of a determination from the National Park Service is required before the Corps may issue a final permit, even if the Corps has been able to identify no potential unreasonable impacts in its analysis under Section 404 of the Clean Water Act or the National Environmental Policy Act. The Department of Justice is responsible for resolving such disagreements when they impact litigation against the United States. In light of this decision by the Department of Justice, the Corps has no option but to formally suspend DA Permit Number 13861, which was granted to you on August 27, 2001.

\* \* \* \* \* \*

It is my understanding that you already have met with the National Park Service to discuss the studies necessary to enable them to make a determination. If you receive the necessary determination of no unreasonable impacts, you may reapply for a new permit for this project. At that point, the Corps will consider the information gathered incident to your initial permit application and the additional information on which the National Park Service based its determination. The Corps then will decide whether to re-issue the permit, or, because of significant new information developed since the permit was issued, to re-evaluate the permit application.[15]

The letter mandated that Searcy County stop any activities undertaken to build the dam and informed the County that it could request a meeting with the Corps "and/or a public hearing to present additional information" within ten days of receipt of the notice.[16] A few days later, on December 9, 2002, the Corps sent a letter formally revoking the permit.

## II. Buffalo National River Legislation

The statute forming the basis for the dispute in the summary-judgment motion is 16 U.S.C. § 460m–11, addressing water resource projects on the Buffalo National River:

The Federal Energy Regulatory Commission shall not license the construction of any dam, water conduit, reservoir, powerhouse, transmission line, or other project works under the Federal Power Act (41 Stat. 1063), as amended (16 U.S.C. 791a et seq.), on or directly affecting the Buffalo National River and no department or agency of the United States shall assist by loan, grant, license, or otherwise in the construction of any water resources project that would have a direct and adverse effect on the values for which such river is established, as determined by the Secretary. Nothing contained in the foregoing sentence, however, shall preclude licensing of, or assistance to, developments below or above the Buffalo National River or on any stream tributary thereto which will not invade the area or unreasonably diminish the scenic, recreational, and fish and wildlife values present in the area on March 1, 1972. No department or agency of the United States shall recommend authorization of any water resources project that would have a direct and adverse effect on the values for which such river is established, as determined by the Secretary, nor shall such department or agency request appropriations to begin construction on any such project, whether heretofore or hereafter authorized, without, at least sixty days in advance, (i) advising the Secretary, in writing, of its intention to do so and (ii) reporting to the Committee on Natural Resources of the House of Representa-

---

**15.** November 20, 2002 Suspension Letter, attached as Exhibit 1 to Doc. No. 47.

**16.** *Id.*

tives and the Committee on Energy and Natural Resources of the Senate, respectively, the nature of the project involved and the manner in which such project would conflict with the purposes of this subchapter or would affect the national river and the values to be protected by it under this subchapter.

Plaintiffs in this case claim that Defendants violated 16 U.S.C. § 460m–11 when they issued a permit to build the Bear Creek dam without awaiting a determination from the Secretary of the Interior, a determination which Plaintiffs feel is required by the statute.

### III. Standard for Mootness

■ Despite the fact that the Corps has now revoked Searcy County's permit to build a dam on Bear Creek, Plaintiffs request that I interpret the statute, declare that Defendants violated the statute when the they issued the permit, and enjoin the Defendants from further violations of the statute. Defendants, however, argue that I no longer have jurisdiction over this dispute (i.e. jurisdiction to issue a declaratory judgment and injunctive relief) because their revocation of the permit rendered the issue moot. For the reasons set forth below, I agree with Defendants.[17]

■ The Plaintiffs argue that, despite the fact that the permit to build the dam has been revoked, I still have jurisdiction to hear the case. They rely on an exception to the mootness doctrine which applies when a defendant has voluntarily ceased a challenged practice—presumably to avoid an unfavorable adjudication. "It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice."[18] However, jurisdiction, properly acquired, may end if (1) subsequent events make it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.[19] The heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness.[20]

The cases relied on by Plaintiffs show that courts have been unwilling to declare a case moot, even where a defendant changes allegedly wrongful conduct, in cases where there is a reasonable expectation that the defendant will return to a previous pattern of conduct following a court determination that a challenge to the conduct is moot. However, these cases are distinguishable. In *Friends of the Earth, Inc. v. Laidlaw Environmental*

**17.** Defendants also argue that there is no waiver of sovereign immunity allowing judicial review of this case under the Administrative Procedure Act, 5 U.S.C. § 704, because there is no longer a "final agency action for which there is no other adequate remedy in a court." In my October 18 Order, I ruled that the Corps' issuance of the permit constituted final agency action. I am not convinced that revocation of the permit erases the fact that the Corps engaged in a final agency action when it issued the permit. However, at least one district court has concluded that there is no longer a final agency action subject to judicial review where the action taken has been withdrawn. *See Willow Creek Ecology v.*

*United States Forest Service,* 225 F.Supp.2d 1312 (D.Utah 2002).

**18.** *City of Mesquite v. Aladdin's Castle,* 455 U.S. 283, 289, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982).

**19.** *Los Angeles County v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979) (citations omitted); *United States v. Concentrated Phosphate Export Assn.,* 393 U.S. 199, 203, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968).

**20.** *Friends of the Earth, Inc. v. Laidlaw Environmental Servs.,* 528 U.S. 167, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000).

*Services,* where environmental groups brought suit under the citizen-suit provision of the Clean Water Act against a holder of a National Pollutant Discharge Elimination System (NPDES) permit, alleging violation of mercury discharge limits and seeking declaratory and injunctive relief. The Supreme Court remanded the case to the district court, holding that the action would not be rendered moot by the permittee's compliance with permit limits, or its closure of the challenged facility, absent a showing that either event made it absolutely clear that the permit violations could not reasonably be expected to recur.[21]

Important facts in that case bear no resemblance to the facts of the case now before me. That case involved a private actor's continuous illegal discharges of pollutants into a river; in fact, the district court found that the permittee violated its discharge limitations thirteen times and committed thirteen monitoring violations and ten reporting violations after the lawsuit was filed. Those facts are easily distinguished from circumstances in which a federal agency[22] has taken official steps and revoked a challenged permit.

The case of *City of Mesquite v. Aladdin's Castle*[23] involved a government actor; however, as in *Friends of the Earth,* the defendants gave a clear indication that the challenged conduct would recur. In that case, Aladdin's Castle brought an action for declaratory and injunctive relief against prohibitions and restrictions contained in a city ordinance governing coin-operated amusement establishments. In a

factual scenario where the city had revised the ordinance while the case was pending in the Court of Appeals and had announced an intention to reenact the challenged provision if it could defeat federal jurisdiction, the Supreme Court held that the city's revision of the ordinance did not moot the action. The Court held that the city's repeal of the objectionable language would not preclude the city from reenacting the same provision if the district court's judgment were vacated. There was also evidence that the city had followed that course with a different restriction, in obvious response to a state court's judgment. Therefore, there was no certainty that a similar course would not be pursued in the future. In the case now before me, the Corps has not announced any intention to reissue the permit assuming it could defeat this court's jurisdiction.

Next, Plaintiffs rely on *United Food and Commercial Workers International Union v. IBP, Inc.*[24] In that case, a union brought suit challenging the constitutionality of two Nebraska picketing statutes and seeking a declaratory judgment. Though that case discusses a defendant's voluntary cessation of a challenged practice, it does so in the context of determining whether plaintiffs had standing. The case does not deal with mootness, other than to note that a labor-dispute of the type present in the lawsuit would fall within the "capable of repetition, yet evading review" exception to the mootness doctrine—a different exception than the one at issue in the case now before me.[25]

21. *Id.* at 193, 120 S.Ct. 693.

22. The determination whether discontinuance of an act moots a case is affected by the distinction between public and private actors. Courts are generally more likely to trust that public officials will cease future violations. 13A CHARLES ALAN WRIGHT & ARTHUR R. MILLER,

FEDERAL PRACTICE AND PROCEDURE § 3533.7 (2d ed.1984).

23. 455 U.S. 283, 289, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982).

24. 857 F.2d 422 (8th Cir.1988).

25. *Id.* at 429 n. 9.

In another case cited by Plaintiffs, *Steele v. Van Buren Public School District*,[26] a student and parent challenged a band teacher's prayer sessions in school. After the action was brought, the teacher voluntarily stopped the prayers, saying they were "counter-productive." There, the Eighth Circuit cited "[t]he *Grant* rule":

> [V]oluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i.e. does not make the case moot. A controversy may remain to be settled in such circumstances, e.g. a dispute over the legality of the challenged practices. The defendant is free to return to his old ways. This, together with a public interest in having the legality of the practices settled, militates against a mootness conclusion.[27]

Under the *Grant* rule, a case may nevertheless be moot if the defendant can demonstrate, under a heavy burden, that there is no reasonable expectation that the wrong will be repeated.[28] According to the Eighth Circuit, the *Grant* rule applies when resumption of the challenged conduct depends solely on the defendants' "capricious" actions—by which they are free to return to their old ways.[29]

In *Steele*, the Eighth Circuit found that the action was not moot, emphasizing the fact that the school district took no official action with respect to prayer at school functions. There was no evidence that the challenged practice would cease. The Court held, therefore, that the district had not carried its heavy burden of showing there was no reasonable expectation that it would permit teachers to conduct prayer in school. Here, the Corps has taken official action to revoke the challenged permit.

Finally, Plaintiffs cite *Neighbors of Cuddy Mountain v. Alexander*,[30] a case in which a group of environmental plaintiffs brought action against the U.S. Forest Service, alleging that it violated the National Forest Management Act (NFMA) when it approved a timber sale on national forest land. That case is distinguishable from the facts before me because that case involved a federally authorized timber sale which was completed before litigation, in other words, the area subject to challenge had already been logged. The Ninth Circuit found that the action was not moot because effective relief could still be granted to counteract the effects of the alleged violation. Here, the federally authorized action has not yet occurred. Thus, there are no measures I could order to mitigate damage.

I find that the facts before me are most similar to the case of *U.S. v. W.T. Grant Co.*[31] In that case, rather than being engaged in clear and repeated violations of a statute, the parties were in the process of attempting to determine the legality of certain conduct. The Government brought civil actions to enjoin violations of the Clayton Act's prohibitions against interlocking corporate directorates. The Government appealed from a district court judgment dismissing its civil actions against three pairs of corporations and Mr. Hancock, who served all as a director (W.T. Grant Co. and S.H. Kress & Co., Sears Roebuck & Co. and Bond Stores, Inc., and Kroger Co. and Jewel Tea Co., Inc.). The complaint alleged that the size

26. 845 F.2d 1492 (8th Cir.1988).

27. *Id.* at 1494 (quoting *U.S. v. W.T. Grant Co.*, 345 U.S. at 632–33, 73 S.Ct. 894).

28. *Id.*

29. *Id.* (quoting *Allen v. Likins*, 517 F.2d 532, 535 (8th Cir.1975)).

30. 303 F.3d 1059 (9th Cir.2002).

31. 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953).

and relationship of each set of companies brought the interlocks within the reach of the Clayton Act, and asked the court to terminate the interlocks and enjoin future violations. Soon after the complaint, Hancock resigned from the boards of Kress, Bond, and Kroger, and the defendants moved to dismiss the action.

In an attempt to show that the trial judge abused his discretion, the Government relied on the following facts: there were three distinct violations, Hancock failed to correct the violations until after suit was filed—despite several years of attempts to persuade him of their illegality, Hancock refused to concede that the interlocks were illegal under the statute, and Hancock failed to promise not to commit similar violations in the future. The Supreme Court noted that, had they been sitting as the trial court, the showing might have persuaded them that the case was not moot, but concluded the Government had not shown the lack of a reasonable basis for the district judge's decision:

> The District Court was not dealing with a defendant who follows one adjudicated violation with others. The only material before the District Judge on the supposed five years of administrative persuasion could easily support an inference during that time the defendant and the Department of Justice were each trying to determine the legality of directorships.[32]

The Court affirmed the judge's finding that the Government's Motion to Dismiss was moot and the judge's conclusion that there was not even "the slightest threat that the defendants would attempt any

future activity in violation of [the Clayton Act] (if they had violated it already)."[33] The Court recited the exception to the mootness doctrine, noting:

> 'When defendants are shown to have settled into a continuing practice ... courts will not assume that it has been abandoned without clear proof. * * * It is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption.'[34]

The Court emphasized, however, that a case "may nevertheless be moot if the defendant can demonstrate that 'there is no reasonable expectation that the wrong will be repeated.'"[35] There must be some "cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive ...."[36] A trial judge has broad discretion, but should consider "the bona fides of the expressed intent to comply, the effectiveness of the discontinuance and, in some cases, the character of the past violations."[37]

Similarly, in the case now before me, the facts do not involve the Corps acting in a clear pattern to violate the Buffalo River legislation. Rather, the Corps was dealing with the legality of issuing a permit in compliance with a law which has never been interpreted by a court of law. The Corps originally took the position that it did not have to await a determination from the National Park Service before issuing the permit for the Bear Creek Dam. Upon a determination by the Department of Jus-

---

**32.** *Id.* at 634, 73 S.Ct. 894 (footnote omitted).

**33.** *Id.* at 630–31, 73 S.Ct. 894.

**34.** *Id.* at 632, n. 5, 73 S.Ct. 894 (quoting *United States v. Oregon State Medical Society,* 343 U.S. 326, 333, 72 S.Ct. 690, 96 L.Ed. 978 (1952)).

**35.** *Id.* at 633, 73 S.Ct. 894 (footnote omitted).

**36.** *Id.*

**37.** *Id.*

tice as to the requirements of the statute, the Corps revoked the Bear Creek permit, and stated that: (1) the Department of Justice is responsible for resolving disagreements on the meaning of statutes; and (2) the Department of Justice has concluded the Buffalo National River legislation requires a determination by the National Park Service before the issuance of a permit. Such self-correction provides a secure foundation for mootness so long as it seems genuine.[38]

The exception to mootness for voluntarily discontinued action places the burden of persuading the court that the challenged practice cannot reasonably be expected to start up again with the party who has voluntarily ceased the challenged practice. I find that this standard assumes that the Defendants have been engaged in a pattern of challenged conduct—such that they must prove they will not resume similar conduct once litigation is concluded. This case is somewhat different than others applying the exception to mootness standard. Here, there is no evidence that the Corps was engaged in a pattern of illegal conduct. Further, there is no evidence that the Corps will reissue a permit for Bear Creek dam, or any other similar project in the Buffalo National River watershed, following the conclusion of this litigation, without awaiting a determination through the Department of Interior. Defendants have formally revoked the permit and ordered Searcy County to conduct no activities toward construction of a dam on Bear Creek. It is important that there are no alleged repeated violations here. In accord with *Los Angeles County* and *Grant,* I find that this official action is sufficient to demonstrate that there is no reasonable expectation the Corps will issue a permit affecting the Buffalo National River without a "go ahead" from NPS. I further find that revocation of the permit has completely and irrevocably eradicated the effects of the alleged violation. A new permit will be required before any similar work can begin in the Buffalo National River watershed.

■ No justiciable controversy is presented where parties are asking for an advisory opinion or where the question sought to be adjudicated has been mooted by subsequent developments.[39] "[T]he oldest and most consistent thread in the federal law of justiciability is that the federal courts will not give advisory opinions."[40] Any presumption of future violations in this case would be purely speculative at this point, making any opinion I might render an advisory opinion. A case is moot where no effective relief can be given, and the only relief I could offer in this case would be an attempt to prevent speculative, future violations by the Corps. No likelihood of further violations has been shown in this case, preventing me from formally interpreting the Buffalo National River legislation and granting the injunctive relief that Plaintiffs request. However, my ruling here does not bar the filing of a new lawsuit in case future disputes arise; a new permit would be subject to judicial review.

---

38. *See* 13A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3533.7 (2d ed.1984) (citing *McCrary v. Poythress,* 638 F.2d 1308 (5th Cir. 1981) (holding that a challenge to application of state law was mooted when defendant officials conceded they had relied on a mistaken interpretation of the law and abandoned their position)).

39. *Flast v. Cohen,* 392 U.S. 83, 85, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).

40. *Id.* at 96, 88 S.Ct. 1942 (quoting CHARLES WRIGHT, FEDERAL COURTS 34 (1963)).

## IV. Conclusion

Plaintiffs' Motion for Partial Summary Judgment (doc. no. 26) is DENIED as moot.